PATOW v. VILLAGE OF OAKWOOD

MUNICIPAL CORPORATIONS—DEFECTIVE STREETS—NEGLIGENCE.

A village is not liable for injuries caused plaintiff by driving across a filled trench, which had recently been opened to lay a water main, and which had been softened by a heavy rain, so that his vehicle sank down in crossing, being outside the 30-foot traveled roadbed and not at an intersection of a street, since reasonable safety for ordinary use is all that can be required of a municipal corporation in caring for the streets.[1]

Error to Wayne; Hally, J. Submitted June 16, 1913. (Docket No. 91.) Decided July 9, 1913.

Case by William Patow against the village of Oakwood and the board of water commissioners of the city of Detroit for personal injuries. Plaintiff discontinued as to the last named defendant. Judgment for defendant village of Oakwood on a directed verdict. Plaintiff brings error. Affirmed.

*Ignatius J. Salliotte,* for appellant.

*Hearn, Sherman & Chapman,* for appellee.

MOORE, J. This is a personal injury case. It was voluntarily discontinued as against the board of water commissioners. From a directed verdict in favor of the other defendant, the case is brought here by writ of error.

The facts are not in dispute. The plaintiff is a market gardener about 50 years old. He had lived in Ecorse about 44 years. The village of Oakwood has

[1] The authorities on the general question of the liability of a municipal corporation for defects or obstructions in streets are discussed in an extensive note in 20 L. R. A. (N. S.) 513.

about 1,000 people. The plaintiff was accustomed to going to the city of Detroit by way of a street in the village known as the Fort street boulevard. This was an unpaved street. On the 14th of August, 1911, he was returning from Detroit with a loaded wagon. We quote from the testimony of the plaintiff:

"I drove back home with this manure as far as Oakwood and a shower caught me there. It looked bad and I thought I would drive in for shelter. It was about 2 o'clock in the afternoon. I drove under the covered scale of Rennie's coal yard. The roadbed there is about 33 feet in width.

"Q. Did you know that they had been laying water mains there?

"A. I seen that they laid water mains; that is, seen them digging the trench, but it was all filled up when I came along there, all smoothed over. There was no sign of there being danger there. Fort street boulevard runs east and west. The water main trench was located about 5 feet from the ditch. It was on the south side of the traveled highway.

"Q. Was the space that the trench occupied a part of the traveled highway?

"A. No, sir.

"Q. Question repeated.

"A. It was in the traveled highway. It was 5 feet from the ditch—the trench—in the highway, not the roadbed. The roadbed in that place is about 30 feet wide."

It is shown that where he entered the coal yard cinders had been thrown into the trench to make it safe. The plaintiff testified:

"A. Yes. When I got up at this portion I kind of hurried up here and turned in something like that [illustrating] to go under the shed to get in out of the rain. It rained pretty hard. It poured a little while.

"Q. It was an extraordinarily heavy rain?

"A. Yes. I was in there from 25 to 30 minutes. The rain came down heavy. When the rain was over I drove on through the shed and around this way. I

came right around the office, which was right in here."

The plaintiff did not leave the coal yard the same way in which he entered. He says it was not practicable for him to do so. He attempted to drive across the trench "a little kitty-cornered." The hind feet of one of the horses sank into the trench, the team sprang forward, and as one, or perhaps both, of the front wheels dropped into the soft earth of the trench, the plaintiff was thrown from the spring seat on which he sat and was hurt.

We have, then, an unpaved street in a country village, with a roadway 30 or more feet wide, outside of which a water main had been recently laid. The earth had been returned by hand. Whether it had been tamped or not does not appear, but the trench had been filled so that it was rounded. This was followed by a heavy rain. The plaintiff saw the situation and attempted to cross the trench, not at a street intersection, with the result already indicated.

The language of McGrath, J., in *Westfall* v. *Board of Water Com'rs*, 93 Mich. 210 (53 N. W. 161), is applicable to this case. He said:

"A ridge near the traveled way can be no more dangerous than a ditch, or a barrier of the same height.   *   *   *   There are necessary uses to which highways are devoted other than travel. Water, gas, and other pipes are usually laid within the highway and between the curbs and ditches.   *   *   *   It is a matter of common knowledge that, in laying pipes in unpaved streets and highways, the filling is done just as it was done in this instance. The earth is rarely tramped down, except where the street is paved or the excavation crosses the street. To require it in every instance would add largely to the expense.

"Streets should be kept reasonably safe for ordinary uses, not absolutely safe against extraordinary contingencies. Some consideration must be had for

the other necessary uses to which highways are devoted."

See, also, *O'Rourke* v. *City of Monroe*, 98 Mich. 520 (57 N. W. 738).

Judgment is affirmed.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred